IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

BONNA L. DODGE                                                                                                PLAINTIFF

v.                                         NO. 1:16-cv-00078 PSH

NANCY A. BERRYHILL, Acting Commissioner                                                DEFENDANT
of the Social Security Administration

MEMORANDUM OPINION AND ORDER

Plaintiff Bonna L. Dodge ("Dodge") commenced this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, she challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Dodge maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Dodge first maintains that her chronic back pain/degenerative disc disease is a severe impairment, and the ALJ erred when she failed to so find at step two of the sequential evaluation process. Dodge also maintains that her residual functional capacity was erroneously assessed because the pain caused by her degenerative disc disease and fibromyalgia was not properly

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

considered.

At step two, the ALJ is required to identify the claimant's impairments and determine whether they are severe. An impairment is severe if it has "more than a minimal effect on the claimant's ability to work." See Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1992) [internal quotations omitted].

Between steps three and four, the ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, and the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of making the assessment, the ALJ is required to evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ makes that evaluation by considering the medical evidence and evidence of the claimant's "daily activities; duration, frequency, and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions." See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

Dodge alleges that she became disabled beginning on April 25, 2013. See Transcript at 144. The ALJ denied Dodge's application for disability insurance benefits on May 10, 2015. See Transcript at 25. Consequently, the relevant time period in this case is from April 25, 2013, through May 10, 2015. Although the evidence prior to April 25, 2013, is outside the relevant period, it will nevertheless be noted in order to place

Dodge's medical condition in a proper context.

The evidence relevant to Dodge's physical impairments reflects that she sought treatment for, inter alia, degenerative disc disease, back pain, and fibromyalgia on several occasions between May 15, 2012, and November 26, 2012. See Transcript at 309-320, 375-376.[2] The progress notes contain no findings as to the limitations caused by her impairments. CT scans of her lumbar spine were performed on September 10, 2010, and August 13, 2012, and the results revealed minimal degenerative disc bulges from L3-4 through L5-S1 with facet arthropathy appearing moderate at L4-5. See Transcript at 277, 376. The notes reflect that she was prescribed medication for her pain.

On April 24, 2013, Dodge saw Richard Van Grouw, M.D., ("Van Grouw") for complaints of chest pain. See Transcript at 298-299.[3] He noted her diagnoses of fibromyalgia and heart irregularities but observed, inter alia, that she is "normally able to be active physically without developing chest discomfort or shortness of breath." See Transcript at 299. Upon physical examination, Van Grouw found Dodge to have a regular heart rate and rhythm with no "murmurs, rubs, or gallops." See Transcript at 299. He

---

[2] The parties devote portions of their briefs to summarizing the evidence relevant to Dodge's mental impairments. See Document 13 at CM/ECF 3-5, Document 14 at CM/ECF 6-8. Dodge, though, does not challenge the ALJ's findings with respect to Dodge's mental impairments. See Document 13 at CM/ECF 5, 8. Because Dodge does not challenge those findings, the Court will not consider the evidence relevant to her mental impairments, save to note any observations made in the evidence that touches on her physical impairments.

[3] The record reflects that Dodge underwent a cardiac catheterization in 2004 and received a pacemaker in 2006. See Transcript at 255-264, 270-272, 276, 281-282. Her complaints of chest pains were thereafter minimal, see Transcript at 275, 293-297, and the notes from a February 10, 2009, cardiology examination were unremarkable. See Transcript at 293-297.

assessed chest pain, atypical for cardiac, and hypertension and adjusted her medication.

Six days later, on April 30, 2013, Dodge presented to the White River Medical Center Emergency Room complaining that she just did not feel right. See Transcript at 331-345. She reported that her hands felt "clammy," see Transcript at 331, and she was having dull chest pains in the middle part of her chest. She reported having had the symptoms previously but reported that Van Grouw had told her the symptoms were related to hypertension. Upon physical examination, Dodge had a regular heart rate and rhythm and exhibited no murmurs. It is also worth noting that an examination of her back revealed normal results. Testing in the form of an EKG and x-rays was performed, and the results were unremarkable. Borderline hypertension was diagnosed, and she was discharged with instructions to see Van Grouw and continue "home antihypertensives." See Transcript at 334.

Beginning on May 7, 2013, and continuing through June 18, 2013, Dodge was seen at the Ozark Medical Center on three occasions for pain associated with fibromyalgia. See Transcript at 306-308 (05/07/2013), 304-305 (05/21/2013), 301-303 (06/18/2013). She reported that she was experiencing a widespread, sharp, aching pain that occurred constantly and caused nausea. She reported that her pain was exacerbated by daily activities, and she was having difficulty standing and sitting. Dodge was examined each time, and the findings were unremarkable. She was repeatedly observed to have normal strength and tone in the lumbar portion of her spine. She was also observed to have normal posture, gait, coordination, and reflexes, although some tenderness was noted.

Her medication was adjusted, and she was referred to a pain specialist.

Beginning on June 26, 2013, and continuing through October 23, 2013, Dodge saw Miraj Siddiqui, M.D., ("Siddiqui") on four occasions for pain management. See Transcript at 355-358 (06/26/2013), 347-351 (07/23/2013), 408-409 (09/25/2013), 403-405 (10/23/2013). At the June 26, 2013, initial consultation, Siddiqui recorded Dodge's history of present illness to be as follows:

> … Refer[r]ing physician has asked my opinion in regards to [Dodge's] pain condition. She has been experiencing this pain for last several years. She reports onset of pain gradual. Stated that the pain has progressively gotten worse, not being controlled with rest, activity modification and medication(s). [She] describes the pattern of pain as constant with intermittent flare ups. She described the quality of pain as aching, stabbing, sharp, deep, cramping and pressure. The pain radiates to back side of both thighs. [Dodge] says, at its worse, her pain is 9/10, at its least it is 2/10, on an average about 5/10, and right now it is 4/10. Worsening factor(s) include: standing, walking, getting up from sitting or lying position, cold weather, pressure changes and increased activity. Relieving factor(s): stopping activities that aggravates pain, rest and taking pain medicine. Other associated symptoms/problems: restrictions on the activities, difficulty sleeping due to pain and frustration because of pain.

See Transcript at 355. Upon physical examination, he observed that her gait and station were antalgic, but she was able to heel-to-toe, heel walk, and toe walk and had normal motor strength and tone in her extremities. He additionally observed the following:

> … Palpation of lumbar facet joints at L3-4, L4-5, and L5-S1 levels reproduced lower back pain. Hyperextension at lumbar spine reproduced lower back pain. Stooping 20-30 degree relief pain. Bilateral facets loading maneuver by lateral flexion/bending reproduced pain. Bilateral lateral rotation also causes pain. **Palpable taut bands/trigger points in bilateral**

> **Latissimus dorsi muscles. Palpable taut bands/trigger points in bilateral Multifidus muscles.** Bilateral straight leg raise test negative.

See Transcript at 356-357 [emphasis in original]. Siddiqui diagnosed, inter alia, lumbosacral spondylosis without myelopathy, degeneration of the thoracic/thoracolumbar intervertebral disc, lumbago, and chronic pain syndrome. He advised her, though, to maintain her normal activities. He also recommended a lumbar medial branch block at L3-4, L4-5, and L5-S1.

On July 23, 2013, Siddiqui performed the lumbar medial branch block. Dodge reported at the September 25, 2013, examination that the procedure did not help her pain. She also reported that her medication was not providing satisfactory pain relief. Although he noted that her pain "severely affects [her] quality of life," see Transcript at 408, he advised her to maintain her normal activities and avoid bed rest. He prescribed hydrocodone and scheduled her for another appointment.

Dodge saw Siddiqui again on October 23, 2013. She reported that her pain had not changed much and was "barely manageable with medication." See Transcript at 403. The findings of a physical examination were consistent with the findings of her earlier examinations, and his diagnoses remained unchanged. She desired to proceed with a lumbar epidural steroid injection, but it is not clear whether one was ever performed. He again prescribed hydrocodone and advised her to maintain her normal activities.

On October 10, 2013, Dodge was seen by Diane Brandmiller, Ph.D., ("Brandmiller") for a mental diagnostic evaluation. See Transcript at 362-368. Brandmiller's observations

are relevant to the assessment of Dodge's physical impairments as Brandmiller summarized Dodge's daily activities as follows:

> [Dodge] lives with her husband. She wakes up between 6 and 10 am. She eats a couple of meals and snacks daily. She cooks occasionally and she thinks she can follow a recipe. She washes dishes once a day and sometimes sweeps for a few minutes. She does laundry weekly. She let[s] the animals outside. She reads [from a] Bible a few minutes at a time. She watches television and she does not use a computer. She has not completed any projects lately. She goes shopping weekly for groceries with her husband or children and she stays in the store for about 30 minutes. She has a driver's license and she last drove alone last week for about 15 miles. She does not like to drive alone on unfamiliar routes. She is not able to read a map. She talks with friends occasionally on the phone. She talks with her mother daily in person or on the phone. She goes out to check the mail daily. She goes to church weekly with her husband. She bathes at least once a day without reminders or assistance. Sometimes she bathes more often because the hot water helps with her pain. She goes to bed around 3 am. She pays most of her bills on the phone. She reports she is able to do basic arithmetic, count back change, and write a check, although she usually uses a debit card.

See Transcript at 363.

Dodge's medical records were reviewed by state agency physicians. See Transcript at 56-71, 73-88. The physicians agreed that her physical impairments were such that she could perform light work with some postural limitations.

Dodge and her husband completed a series of documents in connection with her application. See Transcript at 199-200, 202-209, 212-221. In the documents, Dodge and her husband represented that Dodge has difficulty with, inter alia, lifting, standing, walking, and sitting. She can lift a five pound sack of potatoes but cannot lift a ten pound sack of potatoes because it causes her too much pain. She can only walk a short distance

before requiring a few minutes of rest. She can attend to her personal care, prepare her own meals, and is able to shop, but she cannot perform household chores.

The record contains a summary of Dodge's work record. See Transcript at 160-166. 171. The summary reflects that she worked steadily and had reasonable earnings, particularly for the years between 1999 and 2012.

Dodge testified during the administrative hearing. See Transcript at 35-18. She was born on January 29, 1966, and was forty-eight years old at the time of the hearing. She is sixty-two inches tall and weighs 225 pounds. She worked for Con Agra for several years but stopped working because of the pain in her lower back and legs. She continues to have heart issues that cause her heart to "race too fast, too slow, [or] flat-line ..." See Transcript at 37. She takes Oxycontin for her back pain. She experiences pain in her arms, hips, legs, and feet caused by fibromyalgia and is taking Gabapentin to help relieve the pain. Dodge can sit for about fifteen to twenty minutes without a pillow and can only stand for about fifteen to twenty minutes. She can lift a gallon of milk but cannot carry it very far, and she cannot reach down and pick something up. She avoids climbing stairs and has difficulty sitting for any length of time. She can perform very few household chores but has hobbies that include watching television and attending church.

The ALJ found at step two that Dodge's severe impairments include degenerative disc disease, recurrent arrhythmias, essential hypertension, and fibromyalgia. The ALJ then assessed Dodge's residual functional capacity and found that she can perform light work consisting of lifting or carrying no more than twenty pounds with frequent lifting

or carrying of objects weighing up to ten pounds. The ALJ additionally found that Dodge has the following physical limitations:

> … [Dodge] is able to stand and walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday, provided she is able to alternate to sitting for fifteen minutes after every fifteen minutes of standing. [She] is limited to only occasional crouching and never stooping. She also can occasionally climb ramps and stairs, but never climb ladders or scaffolds. She also must avoid extreme heat, vibrations, and hazards, such as unprotected heights or moving mechanical parts. …

See Transcript at 16. The ALJ found at step four that Dodge cannot perform her past relevant work but found at step five that there is other work she can perform, i.e., work as a cashier II. The ALJ therefore concluded that Dodge is not disabled for purposes of the Social Security Act.

Dodge maintains that her chronic back pain/degenerative disc disease is a severe impairment, and the ALJ erred when she failed to so find. Dodge's assertion is without merit. The ALJ specifically found that Dodge's degenerative disc disease is a severe impairment. It is true that the ALJ did not specifically identify "chronic back pain" as a severe impairment, but the ALJ's failure to do so is harmless error because the finding of degenerative disc disease can reasonably be understood to subsume or otherwise encompass "chronic back pain."

Dodge also maintains that her residual functional capacity was erroneous assessed because the pain caused by her degenerative disc disease and fibromyalgia was not properly considered. The question for the ALJ was not whether Dodge experiences pain

caused by the impairments–she undoubtedly does–but rather the extent to which it impacts the most she can do despite her limitations. The ALJ incorporated a limitation for Dodge's pain into the assessment of her residual functional capacity, finding that she must alternate sitting and standing, but the ALJ did not find the pain to be disabling. The ALJ could find as she did as substantial evidence on the record as a whole supports her characterization of the evidence and supports her assessment of the physical limitations caused by Dodge's pain. The Court so finds for three reasons.

First, the ALJ adequately considered the medical evidence relevant to Dodge's degenerative disc disease. Specifically, the ALJ could and did note that testing of Dodge's lumbar spine prior to the relevant period revealed only minimal degenerative disc bulges from L3-4 through L5-S1 with facet arthropathy appearing moderate at L4-5. Van Grouw observed that Dodge was normally able to be physically active, although he admittedly made the observation in considering her complaints of chest pain. When Dodge was seen at the Ozark Medical Center, the findings with respect to her back pain were unremarkable. Although some tenderness was noted in her lumbar spine, she was observed to have normal strength and tone and normal posture, gait, coordination, and reflexes. When Dodge was seen by Siddiqui for pain management, he noted that pain could be reproduced in her lumbar spine with palpation, hyperextension, stooping, and rotation. He also observed that her gait and station were antalgic, but he noted that she was able to heel-to-toe, heel walk, and toe walk. Siddiqui also observed that Dodge had normal motor strength and tone. It is true that a lumbar medial branch block apparently

did little to relieve her pain, and she sought a steroid injection, but he continued to prescribe medication and recommended that she maintain her normal activities.

Second, the ALJ adequately considered the medical evidence relevant to Dodge's fibromyalgia. In so doing, the ALJ characterized the evidence as follows, a characterization the Court adopts in full:

> … there is no diagnosis that is compliant with SSR 12.2p for fibromyalgia, which requires a diagnosis based on the 1990 ACR Criteria for the Classification of Fibromyalgia, with at least 11 positive tender points on physical examinations, or the 2010 ACR Preliminary Diagnostic Criteria, which requires a history of widespread pain, repeated manifestations of six or more fibromyalgia symptoms, and evidence that another disorder that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.
>
> [Dodge's] treatment record does not contain any trigger point tests. While there are many references to [her] allegations of pain throughout her body and findings of back pain tenderness, tenderness to touch from her mid back through her hips, and tenderness to touch [from] her neck through her thighs, none of these specifically were related to the trigger points. They were merely statements of diffuse tenderness.
>
> Additionally, there is no mention of any control points tested to verify the veracity of [Dodge's] complaints. Secondarily, there is evidence that [another] disorder, [her] degenerative disc disease of the lumbar spine could cause these repeated manifestations of symptoms and signs. In fact, as [her] condition progressed, her physicians treated her primarily for degenerative disc disease of the lumbar spine and the references to fibromyalgia diminished. …

See Transcript at 19.

In evaluating the medical evidence relevant to Dodge's degenerative disc disease and fibromyalgia, the ALJ could and did also rely, in part, upon the opinions offered by

the state agency physicians. They agreed that Dodge's physical impairments were such that she could perform light work with some postural limitations.

Third, the non-medical evidence is capable of more than one acceptable interpretation, and the ALJ's interpretation is one of the acceptable interpretations.[4] The ALJ considered, <u>inter alia</u>, Dodge's daily activities. Although Dodge represented that she can do little during a typical day, the record does not support such a limitation of her daily activities. For instance, Brandmiller observed, and the ALJ could and did find, that Dodge can attend to most of her own personal care. Dodge can prepare simple meals, wash dishes once a day, sometimes sweep for a few minutes, and do laundry weekly. She can shop for groceries and does so weekly. She can drive an automobile but does not drive alone on unfamiliar routes. She talks with friends occasionally on the phone, speaks with her mother daily in person or on the phone, and attends church with her husband. The ALJ could and did also note that Siddiqui recommended that Dodge maintain her normal activities.

The ALJ also considered Dodge's use of medication, and it appears to have been routine until Dodge received a lumbar medial branch block in July of 2013. It appears that afterwards, Siddiqui continued to treat Dodge's pain with medication.

Although the ALJ gave little mention to the remaining <u>Polaski v. Heckler</u> factors,

---

[4] The ALJ did not specifically cite <u>Polaski v. Heckler</u> or thoroughly analyze the <u>Polaski v. Heckler</u> factors, but her failure to do so is not reversible error. The ALJ is not required to cite or even "explicitly discuss" each factor. <u>See Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004). It is sufficient if she simply acknowledges and considers the factors. <u>See Id</u>.

she did not commit reversible error in doing so. The evidence relevant to those factors is minimal and does not support Dodge's assertion of disabling pain.

The governing standard in this case, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions and thus "embodies a zone of choice within which the [ALJ] may decide to grant or deny benefits without being subject to reversal on appeal." See Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994) (internal quotation omitted). Here, the ALJ's assessment of Dodge's residual functional capacity was not improper. The ALJ could find as she did.

In conclusion, the ALJ's findings are supported by substantial evidence on the record as a whole. The ALJ committed no error at step two, and the ALJ's assessment of Dodge's residual functional capacity was within the permitted zone of choice. Dodge's complaint is therefore dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 15th day of March, 2017.

_____
UNITED STATES MAGISTRATE JUDGE